## Richmond

J<small>ACK</small> G<small>ILLISPIE</small> v. C<small>OMMONWEALTH</small> <small>OF</small> V<small>IRGINIA</small>.

December 7, 1942.

Record No. 2631.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Eggleston, JJ.

The opinion states the case.

*George M. Warren,* for the plaintiff in error.

*Abram P. Staples, Attorney. General,* and *Carrington Thompson, Special Assistant,* for the Commonwealth.

Browning, J., delivered the opinion of the court.

Jack Gillispie was convicted of an attempt to rape Virginia Ferguson and was given a term of five years in the penitentiary. The court approved the verdict of the jury. Both persons have lived all of their lives in the little town of Chilhowie, Smyth County, Virginia. They have known each other since they were children, though they were not intimate friends. He never visited her and they never had what are now known as "dates". She worked in a hosiery mill at the extreme east end of the town. His father is a painter and paperhanger and he followed the same trade and had been working at distant places for some weeks before the happening which is the subject of this episode.

On the 16th of September, 1942, at about 12:30 in the morning, shortly after midnight, Miss Ferguson, who was working on the night shift, left the mill for her home, which was about a mile on the other side of town, and walked about two-tenths of a mile from the mill to a point opposite Dr. Dowell's office when she said Gillispie came up behind her and caught her by the shoulders and threw her to the left, trying, she said, to throw her down, but he didn't. She was asked what she did then. She said, "I said, 'All right, Barney Gillispie,'—that's what they call him. Everyone in Chilhowie calls him that. 'You better leave me alone. I didn't have a way home and I'm going down to Pa's and Ma's to see if I can get a way home.' He said, 'Can you prove it's me?' I sorta turned around and saw he had a handkerchief across his face, and after I looked around and saw him I screamed, and he ran, and I turned around and saw him and he went up by Mr. Ed Gray's home, where you go up and turn at Mr. Gray's home you can go that way to go to his home."

This is her testimony as to all that happened at the time. Indeed, it is the case of the Commonwealth, except that she testified that she had seen him twice on her way from the mill to the point of attack; that they met about half way between the lane entrance to the mill and the filling station and that he then followed her.

We will not comment upon the fact that they walked over a sparsely settled portion of the community, he following and presumably could have easily overtaken her where there were no residences but waited to get into a populated part of the district where there was at least one arc light and attack her in front of a doctor's office. We will accept her statement as absolutely true and accord to it all of the probative force to which it is entitled and determine if it meets the legal requisite to establish the guilt of the accused beyond a reasonable doubt.

She was asked if he put his arms around her body. She said, "No." If his purpose was to throw her down the natural and successful way to accomplish it would have been to put his arms around her. She was asked if he tore her dress or bruised her arms, or subjected her to any sort of violence. She said that he did not. She said that he never said a word to her except what we have already detailed.

So, then, the testimony is bare of any threats of violence, any indecent language, any base proposals, nor is there anything indicative of a sordid or unlawful purpose. She uttered just one piercing scream. Mr. Gray and the lady who roomed at his house said that they heard her scream just once. Her own testimony shows that it was not the grasping of her shoulders and swinging her around that caused this. She did not scream until she looked around and saw that his face was partly hidden by a handkerchief mask. That was what really frightened her. After he had grasped her she had quite a little conversation with him. She called him by the same name that everyone else in Chilhowie did, "Barney Gillispie", and told him that she didn't have a way to get home and where she was going to try to get a way. Really, from the testimony, one might deduce almost any purpose. The mask might portend a purpose to kidnap. He might have been so impressed with her from looking through the windows of a restaurant as to want to enact an osculatory scene, or his purpose might have been just to frighten her. We rather incline toward the last solution. The point is that we are wholly in the dark as to what his intentions were. Of course,

in a criminal case, involving a serious charge, no tribunal is permitted to indulge in conjecture.

In a number of cases presenting, for the Commonwealth, stronger facts than are here present, we have said that the evidence was not sufficient to sustain a conviction. See *Mullins* v. *Commonwealth*, 174 Va. 477, 5 S. E. (2d) 491; *Woodson* v. *Commonwealth*, 107 Va. 895, 59 S. E. 1097; *Hairston* v. *Commonwealth*, 97 Va. 754, 32 S. E. 797.

The evidence is wholly insufficient and we reverse the judgment of the trial court.

*Reversed.*